UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Horton, Inc.,

      Petitioner and Counter-Respondent,

v.                                   Civ. No. 07-4459 (JNE/JJG)
                                       ORDER

NSK Corporation, Inc.,

      Respondent and Counter-Petitioner.

_____

Michael H. Streater, Esq., and Brent R. Lindahl, Esq., Briggs & Morgan, P.A., appeared for Petitioner and Counter-Respondent Horton, Inc.

Joseph G. Springer, Esq., Fredrikson & Byron, P.A., and Larry J. Saylor, Esq., and Marta A. Manildi, Esq., Miller, Canfield, Paddock and Stone, PLC, appeared for Respondent and Counter-Petitioner NSK Corporation.[1]

_____

Horton, Inc., petitions the Court for confirmation of an arbitration award against NSK Corporation. *See* 9 U.S.C. § 9 (2000). NSK opposes Horton's application and counter-petitions to vacate the award. The Court has jurisdiction pursuant to 28 U.S.C.A. § 1332 (West 2006). The case is before the Court on Horton's motion to confirm and NSK's motion to vacate. For the reasons set forth below, the Court confirms the arbitration award.

## I. BACKGROUND

### A.     Horton and NSK enter into two contracts for sale of ball bearings

Horton manufactures fan clutches for use in over-the-road trucks. These fan clutches, called Drivemaster clutches, are designed to engage the fans of truck motors only when needed to cool the engines, thereby saving energy. Drivemaster clutch component parts include sets of ball bearings, which must be manufactured to meet Horton's requirements.

---

[1]     In its answer and counter-petition, Respondent and Counter-Petitioner asserts that its correct name is NSK Corporation. Neither party has asked the Court to address this issue.

In September 2000, Horton entered into a three-year contract (2000 MOA) to buy bearings from NSK for Horton's Drivemaster product.  The parties experienced difficulty in agreeing on warranty and liability terms, and the final agreement incorporates the standard terms and conditions of both Horton and NSK, as well as four attached letters that discuss warranty and liability matters.

NSK's standard terms disclaim all warranties except for a warranty on materials and workmanship, establishing the sole remedy of repair or replacement of the defective goods and limiting the warranty to one year in duration.  The relevant passage reads as follows:

> 13)   NSK MAKES NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO THE GOODS DELIVERED UNDER THIS AGREEMENT.  BUYER'S EXCLUSIVE REMEDY FOR ANY CLAIMS OF DEFECTS IN MATERIAL OR WORKMANSHIP SHALL BE THE REPAIR OR REPLACEMENT OF THE DEFECTIVE GOODS OF WHICH NSK IS NOTIFIED OF IN WRITING WITHIN ONE (1) YEAR OF THE DATE OF DELIVERY. NSK SHALL NOT BE LIABLE FOR CONSEQUENTIAL DAMAGES, LOSS OF PROFITS, PERSONAL INJURY, OR COMMERCIAL LOSS ARISING OUT OF OR IN ANY WAY CONNECTED WITH GOODS DELIVERED UNDER THIS AGREEMENT.  THIS WARRANTY IS IN LIEU OF ANY OTHER WARRANTY WHETHER EXPRESS OR IMPLIED.  ALL ACTIONS FOR A CLAIMED BREACH OF THIS WARRANTY MUST BE BROUGHT WITHIN ONE (1) YEAR OF THE DATE THE CAUSE OF ACTION ACCRUES.

In contrast, under Horton's standard terms and conditions, the seller, NSK in this case, makes several warranties:

> 5.  <u>WARRANTIES</u>.  The Seller warrants to the Buyer and its customers and to users of the Goods that all Goods (a) will conform to all specifications, drawings, descriptions, and samples set forth in or referred to in this purchase order and any applicable governmental or regulatory standards . . . (c) will be free from defects in material or workmanship . . . (e) will be adequately and properly contained, packaged, marked and labeled, (f) will be merchantable, (g) will be free from design defects except only with respect to specific designs, if any, provided by Buyer . . . and (i) will conform in all respects to all samples.  If Seller knows or has reason to know the particular purpose for which Buyer intends to use the Goods, Seller warrants that such Goods will be fit for such particular purpose.

The 2000 MOA incorporates a letter dated June 20, 2000, from Horton's Commodity Manager, David Leindecker, to NSK Regional Sales Manager Bob Pagels. In relevant part, Leindecker writes:

> During the [June 8, 2000] meeting, you presented a change to NSK's warranty language via an invoice form with NSK's Terms & Conditions of Sale on the reverse side. Citing paragraph 13, you commented that NSK offers no warranty other than defective bearing replacement.
>
> While I appreciate this is standard boilerplate language, my interest is to share Horton's perspective as we enter into this long term partnering relationship. Horton's expertise is clutch manufacturing. During the development phase of our Drivemaster program, NSK representatives were involved to help determine if NSK could provide a competitive bearing which would not only provide the desired dimensional fit, but also handle the under hood climatic and loading conditions experienced by our OEM truck customers. As the bearing experts, your team returned with confirmation of a design that would fit the purpose, thus providing Horton with the necessary confidence to proceed through testing and enter into a purchase program with NSK for the product.
>
> Therefore, I hope you can appreciate why it is Horton's position that, should an NSK bearing failure be the cause of extensive damage to equipment or life, Horton would expect [its] partner to assist in whatever manner necessary to work out an equitable solution, rather than leave Horton "holding the bag" on NSK's behalf. We propose a modification to NSK's warranty provision, which would allow for joint resolution should circumstances warrant.
>
> Please be assured that Horton is confident NSK's product quality and engineering reputation [are] sound, and warranty claims will not be a problem area between our organizations. However, in understanding and addressing each other's positions up front, we can assure the future success of our relationship, even under the most severe scenarios.

The 2000 MOA also incorporates a letter dated July 18, 2000, from NSK Regional Sales Manager James Babb to Leindecker. In relevant part, Babb writes:

> Concerning our standard warranty, you have already acknowledged that you can appreciate the "boiler plate" language of this statement. Since it is a corporate legal document, we can not modify it. However, we can assure you that, as a partner with Horton, we would assist in whatever manner possible to work out an equitable solution in the event that an NSK bearing failure caused extensive damage to equipment or life.

In September 2003, NSK and Horton entered a second three-year sales contract (2003 MOA).  The 2003 MOA incorporates both parties' standard terms and conditions, but it does not include the letters attached to the 2000 MOA.

**B.      Horton terminates the 2003 MOA and commences arbitration**

In September 2005, Horton terminated the 2003 MOA and, as provided for in both MOAs, commenced arbitration, claiming that NSK provided defective and non-conforming bearings that required Horton to pay substantial warranty claims to Drivemaster customers.[2]  The three-arbitrator panel concluded that the statements in the 2000 MOA on warranties and remedies were contradictory, and the panel heard evidence from both parties regarding their intent on those matters.  The panel determined that NSK's letter promising to "assist in whatever manner possible to work out an equitable solution," along with other MOA language, made it clear that "NSK was not merely standing on its own terms and conditions, but made a commitment to compensate Horton should the bearings be unfit for the Horton application."  The panel also determined that, as NSK conceded, NSK's repair and replacement warranty was operative and that the costs Horton incurred for repairs were recoverable under this warranty.

While the arbitrators acknowledged that the 2003 MOA did not include the letters that were included in the 2000 MOA, they nevertheless concluded that the 2003 MOA was intended, with the exception of the addition of a rebate provision, to be a renewal of the 2000 MOA and that the same warranties were therefore in effect.  In the alternative, the panel stated that the parties' conflicting warranty terms in the 2003 MOA, without the letters from the 2000 MOA to

---

[2]      NSK asserted a counterclaim against Horton for failure to fulfill obligations arising on termination of the 2003 MOA.  The arbitrators rejected the counterclaim, and NSK does not now contest that ruling.

indicate how those terms should be reconciled, cancel each other out.   The panel noted that, in this situation,  U.C.C. gap-filler terms would apply, including an implied warranty of fitness that would permit recovery by Horton.

The panel found that more than "40,000 bearing[s] failed before reaching their expected life" and that the great majority of the failures were due to breaches of warranties on the part of NSK, entitling Horton to recovery.  The arbitrators awarded Horton $23,410,660 in past damages, cover damages, pre-award interest, and future damages, plus post-award interest to be determined and reimbursement of Horton's share of the costs of arbitration.

## II.  DISCUSSION

NSK argues that the arbitrators' award should be vacated because it contradicts the plain language of the MOAs and fails to properly apply governing law.  More specifically, NSK objects to the award on the grounds that the arbitrators:  (1) concluded that the MOAs created warranties in disregard of NSK's disclaimers of warranties; (2) considered the 2000 MOA when construing the 2003 MOA even though the 2003 MOA states that it supersedes all prior agreements; (3) concluded that NSK bore responsibility for bearing design despite contractual language and evidence of the parties' intent to the contrary; (4) ignored the one-year limitations period on NSK's repair and replacement warranty; (5) disregarded the MOAs' choice of law provisions and applicable limitations on damages under Minnesota law; (6) imposed unwritten warranties for 500,000 miles and a 0% failure rate; (7) imposed warranties of fitness despite NSK's lack of knowledge regarding the specific purposes for which the bearings were to be used;  and (8) ignored the fact that Horton conducted its own tests on the sample bearings NSK provided and therefore did not rely on NSK to provide bearings fit for its purposes.  In addition,

in the event no single error justifies vacatur, NSK asks the Court to consider the cumulative effect of the arbitrators' purported errors.

A court reviewing an arbitration award should accord "an extraordinary level of deference to the underlying award itself." *Stark v. Sandberg, Phoenix & von Gontard, P.C.*, 381 F.3d 793, 798 (8th Cir. 2004) (quotation marks omitted); *see also Schoch v. InfoUSA, Inc.*, 341 F.3d 785, 788 (8th Cir. 2003). In fact, courts do not generally review the merits of arbitration awards, *Osceola County Rural Water System, Inc. v. Subsurfco, Inc.*, 914 F.2d 1072, 1075 (8th Cir. 1990), and neither serious legal nor factual errors typically permit a court to vacate an award "so long as the arbitrator is even arguably . . . applying the contract," *Stark*, 381 F.3d at 798 (quotation marks omitted); *Stroh Container Co. v. Delphi Industries, Inc.*, 783 F.2d 743, 751 (8th Cir. 1986) ("We may not set an award aside simply because we might have interpreted the agreement differently or because the arbitrators erred in interpreting the law or in determining the facts.").

Despite the deference granted to an arbitrator's award, an award can still be vacated in exceptional circumstances. *See Schoch*, 341 F.3d at 788. Two narrow, judicially-created reasons exist for vacating an arbitration award.[3] *Id.* First, a court can vacate an arbitration award if it is "completely irrational" in the sense that "it fails to draw its essence from the agreement." *Id.* (quotation marks omitted). "An arbitrator's award draws its essence from the [parties'

---

[3]     The Federal Arbitration Act (FAA) also states reasons for vacating an arbitration award. *See* 9 U.S.C. § 10(a) (Supp. V 2005) (listing reasons including corruption, fraud, undue means, evident partiality, misconduct, or ultra vires acts). NSK's arguments are grounded in the FAA only to the extent that the two judicially-created grounds for vacatur are derivative of grounds for vacatur under the FAA. *Cf. United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960) (intimating that an arbitrator exceeds the scope of his or her authority by failing to ground an award in the essence of the agreement at issue); *Stroh Container*, 783 F.2d at 750 n.11 (suggesting relationship between arbitrator's manifest disregard for the law and vacatur pursuant to 9 U.S.C. § 10(a)).

agreement] as long as it is derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." *Id.* (alteration in original) (quotation marks omitted); *see also id.* at 790 ("Because the arbitrator attempted to comply with the parties' agreement, the award was not completely irrational, as it drew its essence from the agreement."). Accordingly, while a court's disagreement with an arbitrator's interpretation does not justify vacatur, an arbitrator may not settle on an interpretation of a contract that "so directly contradicts the plain meaning of the parties' agreement that it effectively rewrites it." *Boise Cascade Corp. v. Paper Allied-Indus., Chem. & Energy Workers (PACE), Local 7-0159*, 309 F.3d 1075, 1081 (8th Cir. 2002). Similarly, "[i]f an arbitrator attempts to interpret a written agreement that is silent or ambiguous without considering the parties' intent, his award will fail to draw its essence from the [agreement]." *Id.* (alteration in original) (quotation marks omitted); *see also Int'l Woodworkers v. Weyerhaeuser Co.*, 7 F.3d 133, 136-37 (8th Cir. 1993) (indicating that, by failing to seek guidance regarding the parties' intent and past practices, an arbitrator did not merely interpret the contract erroneously but rather inappropriately "dispensed his own brand of industrial justice" and failed to ground his award in the essence of the agreement (quotation marks omitted)).

Second, a court can vacate an arbitration award when it "evidences a manifest disregard for the law." *Schoch*, 341 F.3d at 788 (quotation marks omitted). An arbitrator's disregard for the law is to be distinguished from an arbitrator's erroneous interpretation of the law, which is not a valid justification for vacating an award. *See Stroh*, 783 F.2d at 750. Manifest disregard for the law may be found when arbitrators are shown to have been "fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it." *Stark*, 381 F.3d at 802 (quotation marks omitted). "If an arbitrator, for example, stated the law,

acknowledged that he was rendering a decision contrary to law, and said that he was doing so because he thought the law unfair, that would be an instance of 'manifest disregard.'" *Lincoln Nat'l. Life Ins. Co. v. Payne*, 374 F.3d 672, 675 (8th Cir. 2004).  Arbitrators need not elaborate on their reasoning supporting an award, so an arbitrator's failure to clearly identify the applicable law or to explain how the law applies does not demonstrate the required disregard for the law that invites a court to substitute its own judgment.  *See Stroh*, 783 F.2d at 750.

*Warranties other than a repair and replacement warranty*

NSK argues that the arbitrators ignored NSK's clear disclaimers of warranties and exhibited manifest disregard for the law by concluding that the MOAs established warranties other than NSK's limited repair and replacement warranty.  As the arbitrators concluded, conflicting terms rendered the MOAs ambiguous on the matter of warranties and liability, and the panel's ultimate construction of the contract was plausible and supported by testimony regarding the parties' intentions.[4]

*Consideration of the 2000 MOA during interpretation of the 2003 MOA*

NSK asserts that the arbitrators erred by considering the 2000 MOA when construing the 2003 MOA, which contains a clause stating that the 2003 MOA supersedes all prior agreements. Because both parties' conflicting standard terms and conditions are included in the 2003 MOA, the effect of the warranty provisions is ambiguous.  As a result, it was appropriate for the arbitrators to look to extrinsic evidence of the parties' intentions, and, in this case, extrinsic

---

[4]     For example, Leindecker stated that he understood (1) his June 20 letter as requesting an agreement that NSK be liable for consequential damages and (2) NSK's July 18 letter as agreeing to such liability despite inability to alter NSK's corporate document.  In addition, Babb stated that he did not recall discussions with Leindecker on the issue of damages, but he did testify that he intended the "equipment" referenced by the phrase "extensive damage to equipment" in the July 18 letter to mean "[t]he truck," "the clutch, the equipment, [and] the bearing itself."

evidence properly includes the parties' course of dealing, which encompasses the 2000 MOA. *See* Minn. Stat. § 336.2-202 (2006) (stating that course of dealing can be used to explain the final written expression of parties' agreement); *Apple Valley Red-E-Mix, Inc. v. Mills-Winfield Eng'g Sales, Inc.*, 436 N.W.2d 121, 123 (Minn. Ct. App. 1989) (indicating that parol evidence may be considered to ascertain the intent of parties to an ambiguous contract containing an integration clause). There is evidence that the parties intended the 2003 MOA to be almost entirely a renewal and continuation of the 2000 MOA and that liability issues were likely not discussed during negotiations in 2003. Any error of law or interpretation arising from consideration of the 2000 MOA when construing the 2003 MOA is not grounds for vacatur.

*Design responsibility*

NSK makes various arguments related to refuting its responsibility for design issues. The arbitrators determined that the 2000 MOA made NSK responsible for bearing design, and they cite as support the June 20 letter mentioning NSK's "confirmation of a design" and language in the 2000 MOA requiring NSK to provide "[f]ull Drivemaster program design engineering."[5] The arbitrators, however, did not explicitly determine that the MOAs created a design defect warranty.[6] Therefore, NSK's arguments specifically aimed at undermining a design defect warranty are inapposite. Moreover, any broader dispute over NSK's design responsibility relates

---

[5]     NSK notes that the complete phrase—"Full Drivemaster program design engineering and production start up support"—lacks a comma to separate the design provision from the production start up support provision. NSK argues that this indicates that NSK's design duties are limited to start-up support. The Court disagrees. *Cf. United States v. Bank*, 404 U.S. 336, 340 n.6 (1971) (discussing comma usage in the context of a limitation clause following a series of antecedents).

[6]     Instead, the issue of NSK's responsibility for design appears to be raised as evidence that Horton relied on NSK to produce bearings fit for Horton's uses and that NSK knew or had a duty to learn of Horton's uses for the bearings.

to conflicting evidence and competing plausible interpretations of an ambiguous contract and consequently is not reason to vacate the arbitration award.

*One-year limitations period*

NSK claims that the arbitrators ignored the unambiguous contractual language applying a one-year limitations period to NSK's repair and replacement warranty. The arbitrators did not ignore this language. Instead, they found that the one-year period was negated by language in the July 18 letter and that it would not have applied to the fitness warranty in any event. Any error in the arbitrators' award on this matter does not rise to the level needed to justify vacatur.

*Purported limitation on damages under Minnesota law*

NSK argues that the arbitrators disregarded the contracts' Minnesota choice-of-law provisions and ignored clear Minnesota authority establishing limits on the damages recoverable by Horton. Specifically, NSK asserts that *Soo Lines Railroad Co. v. Fruehauf Corp.*, 547 F.2d 1365, 1378 (8th Cir. 1977), demonstrates that, under Minnesota law, direct damages for nonconforming-but-accepted goods may not exceed the difference between the value of the goods as warranted and the value of the goods as received. NSK then complains that the panel reached a different result by improperly relying on an opinion applying Illinois law.

*Soo Lines* does not establish such a limitation on damages. The opinion recounts a trial court's detailed jury instructions on damages, which included such a statement about the maximum possible damages, but the instructions are mentioned only as evidence that an expert's erroneous testimony regarding damages was not prejudicial. *See id.* The court in *Soo Lines* did not explicitly state that such a limitation on damages would be appropriate in all cases. Moreover, the *Soo Lines* opinion cites to no legal authority that clearly demonstrates that such a limitation on damages should apply under the facts of the present case. *Cf.* Minn. Stat. § 336.2-

714(1) (2006) ("Where the buyer has accepted goods and given notification . . . the buyer may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."); *id.* § 336.2-714(2) (allowing for variation in calculation of damages for nonconforming-but-accepted goods in "special circumstances").  At best, NSK can establish debatable grounds to conclude that the arbitrators awarded Horton damages in excess of direct damages flowing from the breaches of warranty.  *Cf.* Minn. Stat. Ann. § 336.2-714(1) 1966 Minn. Code Cmt. (West 2002) ("[T]he distinction between the damages allowed by subsection 2-714(1) and the 'incidental' and 'consequential' damages allowed by U.C.C. § 2-715 is unclear."); *Litton Microwave Cooking Prods. v. Leviton Mfg. Co.*, 15 F.3d 790, 797 (8th Cir. 1994) (affirming, in a case decided under Minnesota law, a trial court's refusal to award the service costs of replacing nonconforming component parts because such costs were not reasonably incurred and not because they were not recoverable under Minn. Stat. § 336.2-714).  Therefore, even assuming that the arbitrators concluded that Horton was entitled not to consequential damages but to direct damages only, NSK identifies no clearly defined legal principle of Minnesota law that was disregarded by the arbitrators.

*Unwritten warranties for 500,000 miles and a 0% failure rate*

NSK claims that the arbitrators effectively rewrote the contracts to include warranties for 500,000 miles and a 0% failure rate, terms that were not in the contracts.  Though the arbitrators never explicitly found that such warranties applied, NSK contends that the arbitrators adopted them implicitly by awarding damages to Horton for all customer claims under Drivemaster warranties—warranties that ran up to 500,000 miles—that were attributable to breaches of NSK's warranties to Horton.  Assuming the arbitrators' decision necessarily meant that the

bearings were required to meet such specifications, evidence indicates NSK was aware that Horton expected the bearings to last 500,000 miles and that NSK did not inform Horton it would not provide such a warranty.  Accordingly, a finding that a 500,000 mile guarantee was part of the express warranty of fitness would not justify vacatur.  Regarding the 0% failure rate, no failure rate was specified in either MOA.   The July 18 letter mentions "an equitable solution in the event that an NSK bearing failure caused extensive damage," but it does not indicate whether such a solution would include payment for all or merely some of that damage.  Similarly, NSK's repair and replacement warranty does not incorporate a failure rate.  Therefore, a conclusion by the panel that there was no acceptable failure rate for the warranty of fitness, even if erroneous, would not justify vacatur.  *Cf. Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (stating that even an "improvident" or "silly" finding is not grounds for vacating an arbitration award).

*Knowledge of particular purposes for which the bearings were used*

NSK claims that it lacked knowledge regarding all of Horton's applications for the bearings, and NSK asserts that this alleged lack of knowledge negates any warranty of fitness for a particular purpose.  The panel concluded that NSK "was well aware the general environment and application for the bearings was to be in over-the-road and heavy trucks."  The testimony of Horton's Chief Technical Officer supports a conclusion that awareness of the general environment was adequate, as he testified that the core "clutch pack" remained essentially the same in all of Horton's applications.  Moreover, the panel also concluded that NSK's design responsibility meant that NSK had a duty to seek out additional information if needed to fulfill its design duties.  Even if the panel erred in concluding that NSK possessed general information

sufficient for the warranty to apply or that NSK should have known of Horton's uses for the bearings, such error would not constitute grounds to vacate the award.

### Horton's testing of sample bearings

NSK asserts that Horton's testing of sample bearings negates the implied warranty of fitness by negating the element reliance.  *See* Minn. Stat. § 336.2-315 to -316 (2006).  However, Horton is asserting—and the arbitrators found—an *express* warranty of fitness.  Moreover, even under an implied warranty of fitness, testing would only negate that warranty "with regard to defects which an examination ought in the circumstances to have revealed," *id*. § 336.2-316(3)(b), and the arbitrators concluded that damages would also be recoverable under NSK's repair and replacement warranty.  Any error on this matter does not justify vacating the award.

### Cumulative effect of purported errors

Finally, NSK asks the Court to consider the cumulative effect of the arbitrators' purported errors and conclude that vacatur is required.  *Cf. George A. Hormel & Co. v. United Food & Commercial Workers, Local 9*, 879 F.2d 347, 349 (8th Cir. 1989) ("The district court carefully considered each claim separately and did not find sufficient evidence that the arbitrator had not fulfilled his responsibility.  We have considered the claims as a group, and conclude that the arbitrator's decision manifests an infidelity to his obligation.").  NSK's arguments center on assertions that the arbitrators failed to follow clear language in the 2000 and 2003 MOAs.  The arbitrators were faced with the clear language cited by NSK, but similarly clear but contradictory language elsewhere in the MOAs.  The ambiguity that arises from inconsistent "clear" language could have been settled by the parties when they entered the MOAs.  But it was not, and the difficult job of interpretation was left to the arbitrators.  Viewed as a whole, the arbitrators'

award is grounded in the essence of the contracts and represents a good faith effort to interpret

the MOAs in light of the contractual language and evidence of the parties' intentions.

### III.  CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.    Horton's Motion for Confirmation of Arbitration Award [Docket No. 3]
       is GRANTED.

2.    NSK's Motion to Vacate the Arbitration Award [Docket No. 10] is
       DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  February 27, 2008

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge